U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2017 AUG 21  PM 3: 19

CLERK

BY_____
DEPUTY CLERK

JACOB CARNELLI,                    )
                                   )
        Plaintiff                  )
                                   )
        v.                         )        Case No. 2:15-cv-142
                                   )
ADARBAAD KARANI,                   )
                                   )
        Defendant.                 )

**OPINION AND ORDER
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 41)

Plaintiff Jacob Carnelli asserts claims against Defendant Adarbaad Karani alleging

tortious interference with contract, defamation, and intentional infliction of emotional

distress, arising from Defendant's written communication with Plaintiff's employer.

Pending before the court is Defendant's motion for summary judgment (Doc. 41), which

Plaintiff opposes. The court heard oral argument on February 23, 2017. On March 22,

2017, the court ordered supplemental briefing with regard to Defendant's defense that a

release entitles him to summary judgment. Defendant filed his supplemental brief on

April 14, 2017 (Doc. 58) and Plaintiff filed his on April 25, 2017 (Doc. 59) whereupon

the court took the matter under advisement.

Attorneys John Markham, II, Esq. and Bridget A. Zerner, Esq., represent Plaintiff.

Attorneys Evan C. Ouellet, Esq. and Samuel Perkins, Esq. represent Defendant.

**I.    The Undisputed Facts.**

**A.    The June 2009 Incident.**

In June 2009, Plaintiff was a twenty-one year old college student living in Boston,

Massachusetts. On or around June 6, 2009, Plaintiff was involved in an altercation at the

Revolution Rock Bar in Boston in which he alleges that he was physically removed from

the bar and beaten by Defendant and three other bar employees (the "June 2009

incident"). At the time, Defendant was employed as a police officer with the Boston Police Department and was working at Revolution Rock Bar as part of a security detail. The June 2009 incident resulted in Plaintiff being charged with assault and battery with Defendant identified as the alleged victim. The charge was subsequently dismissed.

In the summer of 2010, Plaintiff moved to Vermont and applied for employment with the Vermont Department of Corrections ("VT DOC"). In September of 2010, VT DOC hired Plaintiff as a temporary correctional officer while the criminal case against him was still pending. In April of 2011, Plaintiff completed his probationary period, became a full-time correctional officer, and was assigned to the Chittenden Regional Correctional Facility in South Burlington.

On June 23, 2011, Plaintiff filed a civil lawsuit in Massachusetts state court against Defendant and others alleged to have been involved in the June 2009 incident (the "Massachusetts action"). At approximately the same time, Plaintiff filed a complaint against Defendant with the Boston Police Department's Internal Affairs division, asserting that Defendant had made false statements in connection with the June 2009 incident. This complaint had the potential of resulting in discipline for Defendant such as a sanction, a suspension, or termination depending upon Internal Affairs' findings.[1]

In conjunction with the Massachusetts action, multiple witnesses were deposed, including Raymond Carnelli (Plaintiff's father) and Jeremiah Carnelli (Plaintiff's brother).

     **B.**     **Depositions from the Massachusetts Action.**

          **1.**     **Excerpts from Raymond Carnelli's Deposition.**

Q.     Prior to the [June 2009 incident], had your son had any episodes of suicide?

A.     No.

Q.     Any suicidal thoughts?

---

[1] Defendant initially testified that Plaintiff's Internal Affairs complaint was the only one that had been filed against him. After a break in his deposition, during which he consulted with his attorney, Defendant acknowledged that he was currently on administrative leave because of an unrelated Internal Affairs' investigation.

A.    Not that I'm aware of.

Q.    But you are aware that since the June 2009 incident, he's had episodes of suicidal thoughts?

A.    I've kept him within arm's reach, yes.

Q.    Did he actually attempt suicide at some point?

A.    I don't know.

Q.    After the incident -- after the June 2009 incident, you were describing that your son has had homicidal thoughts, correct?

A.    Yes.

Q.    Tell me about those.

A.    Wants to kill police officers and the bouncers at Revolution, all the ones that tried to kill him.

Q.    Has your son acted on these thoughts in any way?

A.    No.

(Doc. 43-4 at 2, 75:18-76:16.)

Q.    Are you aware that [Plaintiff] was diagnosed with [post-traumatic stress disorder]?

A.    Yes.

Q.    Did you observe him suffering from PTSD?

A.    I'm not a doctor, but some of the symptoms I've seen from him, people describe that's what [PTSD] is.

Q.    What symptoms did you see?

A.    Sensitivity to light.  Sensitivity to noise.  Sensitivity to communications.  Sensitivity to people in a room.  Sensitivity to access to a room.  Sensitivity to the size of the room.  Sensitivity to how high or how low the ceiling is.  Sensitivity to a woman walking down the hallway in her high heels.  Sensitivity to animals barking. Sensitivity to people talking to you.  Paranoia.  Confusion.  Anger. Touching.  Feeling.  Basically just living.  So that's why -- never mind.

Q.    Did you see him experience any night terrors?

A.    Constantly.

Q.    So every night?

A.    Every night and every day when the medications ran off.

3

Q.     How did you know he was suffering from a night terror?

A.     He would be screaming and thrashing about.

Q.     Were you able to wake him?

A.     Sometimes yes, sometimes no.

Q.     How were you able to assist him when he had a night terror?

A.     I'd hold him.

Q.     And then the terror would subside?

A.     Yeah.  Tell him he's not dead.

Q.     Do you --

A.     Then he'd tell me he wants to be dead.

(Doc. 46-5 at 6-7, 47:8-48:21.)

Q.     Have you observed [Plaintiff] suffering from depression?

A.     Yes.

Q.     What symptoms have you observed?

A.     He wants to kill himself.

Q.     What other symptoms?

A.     Wants to kill somebody else.

Q.     Is he in treatment for these symptoms?

A.     Yes.

*Id.* at 8, 50:4-12.

Q.     Have you observed [Plaintiff] continue to suffer from these
       conditions as we sit here today?

A.     Yes.

Q.     Are any of the ailments that he's suffered no longer present today?

A.     No.

Q.     So everything is still ongoing?

A.     Yeah.

*Id.* at 8-9, 50:18-24-51:1.

Q.     Now, you've described a fair number of symptoms that your son
       continues to experience through today as a result of [the June 2009
       incident], correct?

A.     Correct.

4

Q.     Are those interfering in any way with his ability to do his job?

A.     I believe so.

Q.     How?

A.     It's caused considerable stress on him.  As far as work performance, no.  I think he's admirable, and he's saved a couple of women['s] lives, suicide attempts at the prison.

Q.     So as far as his work performance goes, you're not aware that anything in connection with this incident is affecting his work performance as we sit here today?

A.     Correct.

*Id.* at 10-11, 82:15-83:8.

## 2.     Excerpts from Jeremiah Carnelli's Deposition.

Q.     To your knowledge, did [Plaintiff] experience any suicide ideation prior to the [June 2009] incident?

A.     Prior to the [June 2009] incident?  No.  I don't remember him saying anything like that.

Q.     What about homicidal ideation prior to the [June 2009] incident?

A.     Prior to the [June 2009] incident?  No.

Q.     What about since the [June 2009] incident?

A.     Since the [June 2009] incident, homicidal?

Q.     Yes.

A.     He wants to kill people?

Q.     Yes.

A.     Well, I think if anything, if anyone was savagely beaten like that, they'd want to, you know, kill their assailants.

Q.     Is the answer to that yes?

A.     Yes.  If you were savagely beaten, wouldn't you want to see justice like that?

Q.     Are you aware if he's taken any steps to act on that ideation?

A.     No.  He's not taken steps to act on that.  That's why we're here.

(Doc. 43-5 at 3, 70:10-71:8.)

### 3.     Excerpts from Plaintiff's December 6, 2012 Deposition.

Q.     Tell me a little bit about suicidal thoughts.  How often do you have suicidal thoughts?

A.     Approximately once a month.

Q.     Have you sought treatment for this?

A.     I see Cheryl Jacques as counselor, and I also use my brother, who's in the mental health profession.  He helps me out too.

Q.     This is Jeremiah?

A.     Yes.

Q.     Have you ever tried to act on any of these thoughts?

A.     No.  Good men dream to do bad.  They don't act on impulses.

Q.     So the impulses go away?

A.     I don't act on impulse.

Q.     What about homicidal thoughts?  Tell me about that.

A.     Same thing.

Q.     Who do you feel these thoughts towards?

A.     All my assailants are walking free.  The three years of pain and misery, anxiety, depression that I had been suffering and they're all walking free in the street, and then the system tried to criminally charge me for something I didn't do.

Q.     When you're referring to assailants, you're referring to who?

A.     [Defendant] and the several bouncers that were involved that night.

Q.     Have you ever tried to act on any of those homicidal thoughts?

A.     No.

Q.     Do you still have those kinds of thoughts today?

A.     Look where I am.

Q.     So do you have those types of thoughts today?

A.     Yes.

Q.     Do you have them every day?

A.     Depending.

Q.     What does it depend on?

A.      Depends on my mood, depends on what's going on in life and it depends on how much sleep I got.

Q.      So if you're stressed out, you might be more inclined to have homicidal thoughts?

A.      Yes, only on those individuals because they tried to kill me and somehow they're still getting away with it.

Q.      So the thoughts are specific to your assailants, as you call them?

A.      Yes.

Q.      Ever have these types of homicidal thoughts towards anyone else?

A.      No.

(Doc. 43-6 at 6-7, 211:1-213:7.)

Q.      So taking a look at Exhibit 3, what do we have here?

A.      A picture of [Defendant] in his Facebook account.

Q.      Did you print this out?

A.      Yes.

Q.      When did you print it out?

A.      [April 7], 2010.

Q.      Are you friends with [Defendant] on Facebook?

A.      No.

Q.      What's this second page we have here of Exhibit 3?

A.      It shows him at the two-year anniversary in regular clothes, it shows that him and Revolution were tight.

. . .

Q.      And did you print this from Revolution's website?

A.      My brother did.

Q.      Do you recall when he printed that?

A.      I don't remember.

Q.      And the third page of Exhibit 3, what do we have here?

A.      It's [Defendant's] Facebook picture as of the last time I checked, [October 14, 2012], and he's standing inside the Revolution Rock Bar.

Q.      Do you pull up [Defendant's] Facebook page regularly?

A.      Yes, to show his connection with Revolution.

Q.      It's your position that his connection with Revolution is shown because he's standing inside of Revolution, is that correct?

A.      Yes, in civilian clothes, so it shows he's not only there for on-duty purposes.

*Id.* at 8, 223:7-224:20.

### 4.      Excerpts from Plaintiff's January 8, 2013 Deposition.

Q.      You have had homicidal and suicidal thoughts, correct, since [the June 2009 incident]?

A.      I mean, how would you think about it if a bunch of cops that were there to protect and serve you, laughed in your face, threw you on the ground, beat the crap out of you, and then tried covering it up?

Q.      I don't know.  I really don't.  But the thoughts that you have, are they during dreams?  Are they at night when you are sleeping?

A.      At points, with the night terrors and the anxiety.

Q.      What about when you are awake during the day?  Do you think thoughts or images of you killing one of the people that was involved in this assault?

A.      Good men dream to do bad.  They never act on impulse, like the gentlemen that you are trying to protect and the gentlemen that work for the State.  They acted on impulse, which is a criminal mindset.

Q.      Okay.  I understand.  I am just asking you about your thoughts.  I understand.  But while you are awake, do you have thoughts about killing the people that were involved in the [June 2009] incident?

A.      Self defense.  I will never let those individuals ever touch me again.

Q.      The thoughts you have, are they like a visual image you have of you killing them?

A.      No.  Just they will never lay a finger on me again.

Q.      So you don't have a visual image of you killing any of the people involved in [the June 2009] incident?

A.      Good men dream to do bad.  But they don't act on impulses.

Q.      Is that a yes or a no, or you don't know?

A.      I don't know.  I really don't know.

Q.      Have you ever had a visual image of you killing one of the people involved in [the June 2009 incident]?

8

A.   Good men dream to do bad.  They do not act on impulses.  That is the way I am going to answer the question.

Q.   It is nonresponsive.

A.   When you get your face kicked in with several individuals, then we can sit down and talk about it.

Q.   When you have these thoughts, these homicidal thoughts against the people that harmed you that night, is there a certain weapon in mind that you are using during your homicidal thought?

A.   They are angry thoughts.

Q.   So you haven't had an image of you actually killing one of these people that was involved in the assault?

A.   No.

(Doc. 43-7 at 4-5, 429:19-432:9.)

Q.   Hi, Mr. Carnelli.  Can you tell me, do you currently own any firearms?

A.   Yes.

Q.   How many?

A.   I have the Ml Garand .30-06 rifle, World War II, because I love to collect nice firearms.

Q.   Any others?

A.   I have a Colt 1911.  My grandfather worked in a Colt factory during the war.  And we live in -- I grew up in Hartford, Connecticut, so I figured I had to have a 1911 from Hartford as another relic.

Q.   Is that a handgun?

A.   Yes.

Q.   And any other guns?

A.   I have a Springfield XDS.

. . .

Q.   What type of firearm is that?

A.   It is a small carry 45-caliber.

Q.   When you say "small carry," is that the same thing as a hand gun?

A.   Yes.  It is just a smaller gun.

Q.   Any others?

A.    AK-47.

Q.    What do I use that for?

A.    I love to shoot and practice shooting.  It is a stress reliever.

Q.    Do you do that at a range?

A.    Yes.

Q.    Do you have any other firearms?

A.    No.

Q.    How long have you had that AK-47?

A.    Approximately a year.

Q.    How about the Springfield XDS?

A.    Approximately nine months.

Q.    The Colt [19]11?

A.    Three months.

Q.    And the MI Garand rifle, World War II?

A.    Two years.

Q.    Did you bring any of those weapons into Massachusetts with you to come to this deposition?

A.    No.

Q.    Do you have any weapons with you, whatsoever, at the deposition today?

A.    No.

*Id.* at 2-3, 258:11-260:10.

### C.    Defendant's January 9, 2013 Memorandum.

Defendant's deposition took place on January 9, 2013, the day after Plaintiff's second deposition and was held at the City of Boston's Law Department in Boston City Hall.  Prior to the deposition, Defendant's attorney informed him that she had an obligation to advise him that Plaintiff had "testified [in deposition] that he had suicidal thoughts as well as homicidal thoughts towards the people in the [Massachusetts Action], including [Defendant]" and that Plaintiff "testified that he checked [Defendant's] Facebook on a regular basis."  (Doc. 43-8 at 6, 21:3-7.)  She stated that "based on [Plaintiff's] behavior and what he testified to, that [she] had concerns about his mental

10

status[,]" *id.* at 7, 24:19-21; that Plaintiff was employed by VT DOC and "had numerous firearms, including an AK-47." *Id.* at 8, 25:13. She further advised that Plaintiff intended to attend Defendant's deposition and that she and Plaintiff's attorney had agreed that Defendant would attend his deposition in civilian clothes and without his service weapon. Defendant was not provided with deposition transcripts in the Massachusetts Action; his knowledge of Plaintiff's deposition testimony was derived solely from his attorney's report.

On January 9, 2013, Defendant was scheduled for a regular shift as a patrol officer. His supervisor was Captain Francis Armstrong who was not at the station on that date. Prior to attending his deposition, Defendant wrote the following memorandum to Captain Armstrong:

1/09/2013

DISTRICT/UNIT: Area E – District 18

To: Captain Francis Armstrong, District Commander

From: Police Officer Adarbaad Karani, ID #98659

SUBJECT:            Homicidal Threats Made Towards Myself

I respectfully report that I was recently informed by my Assistant Corporation Counsel Nicole Loughlin for the City of Boston Law Department that during Jacob Carnelli's deposition during an ongoing lawsuit, **he made suicidal and homicidal threats towards me.** She stated that she is also concerned about his mental status and his possible actions. He also stated that he checks my personal [F]acebook page on a daily basis. As of 01/07/2013 I have disabled my personal [F]acebook account. He possesses numerous firearms and is employed by the Department of Corrections for the State of Vermont. I would request that his employer is made aware of these threats for his own personal safety and for the safety of those he is sworn [to] protect.

I am scheduled to go to City Hall today 01/09/2013 at 9:00 am for my deposition. Nicole Loughlin left a voicemail yesterday 01/08/2013 at about 5:00 pm stating that there was some type of agreement that was made and they are requesting me to arrive in plain clothes and unarmed. I am on a regular tour of duty from 7:30 am to 4:00 pm. I am extremely uncomfortable and concerned about my safety. I must respectfully deny this request especially after the type and severity of the threats that have

been made.  If for some reason I must arrive under their conditions, I will request an on-duty, full-uniformed, fully equipped Police Officer to be present.  I will request I have verbally notified my supervisor Lieutenant Michael Locke of the situation.  I have faxed a copy of this report to the Boston Police Legal Advisor after 9:00 am.  I have faxed a copy of this report to the Boston Police Patrolmen's Association and will also notify them via phone after 9:00 am.

Respectfully submitted,

Police Officer Adarbaad Karani

ID #98659

(The "Memo") (Doc. 43-11 at 2) (emphasis supplied).

Defendant placed a copy of the Memo in the Captain's mailbox and faxed a copy to him.  Defendant also faxed copies to the Office of the Boston Police Legal Advisor and to his union representative in the Boston Police Patrolman's Association.

Defendant attended his deposition in plain clothes and without his service weapon. Another officer sat in the lobby of the City of Boston Law Department while the deposition was conducted.  Plaintiff attended Defendant's deposition without incident.

On January 10, 2013, Defendant reported for work and called and requested VT DOC's fax number.  He then faxed the Memo to VT DOC with a one-page coversheet. This was Defendant's sole contact with VT DOC.  When interviewed by Internal Affairs, Defendant acknowledged the Memo's potential impact on Plaintiff's employment:

> Q.    Did you feel like you knew that could possibly jeopardize his . . . employment?
>
> A.    Uh, yeah, I was aware of that.  Yes.

(Doc. 46-10 at 13-14, 13:22-14-1.)

**D.    VT DOC's Receipt of the Memo and Plaintiff's Leave of Absence.**

On January 11, 2013, William Lawhorn, Director of Facility Operations for VT DOC, received Defendant's fax coversheet and the Memo.  Prior to this receipt, VT DOC had no concerns regarding Plaintiff's fitness for duty.  Mr. Lawhorn provided the Memo to Robert Arnell, the Superintendent at the Chittenden Regional Correctional Facility; Roxanne Royce, a human resources manager for Vermont Department of Human

Resources ("VT DHR"); Sarah Jewett, a VT DHR human resources administrator; Earl
Fechter, a Unit Supervisor for the VT DHR Investigations Unit; and James Rice, an
investigator for the VT DHR Investigations Unit.

On or about January 13, 2013, Mr. Arnell contacted Captain Armstrong and spoke
with him about the June 2009 incident. The following day, Mr. Arnell performed a
Vermont Criminal Information Center ("VCIC") and a National Crime Information
Center ("NCIC") records check on Plaintiff which showed no charges. Mr. Arnell
testified at deposition:

> [W]e have the whole Human Resources Department involved at that point
> to determine the risk factors of [Plaintiff]. We run the VCIC and the NCIC
> and we have no, we have no charges; we have nothing. So it becomes
> questionable about where the truth lies.

(Doc. 43-13 at 10, 88:9-15.)

On January 14, 2013, Mr. Fechter assigned Mr. Rice to investigate the contents of
the Memo. The "entire scope" of Mr. Rice's assignment in investigating the Memo was
to contact attorney Loughlin to obtain copies of the Massachusetts action deposition
transcripts and to inquire regarding the deposition testimony. (Doc. 53 at 27, ¶ 40.) On
January 25, 2013, attorney Loughlin e-mailed excerpts of Plaintiff's, Raymond
Carnelli's, and Jeremiah Carnelli's depositions to Mr. Rice. Attorney Loughlin did not
discuss the contents of the transcripts with Mr. Rice, nor did she speak with anyone at VT
DOC or VT DHR.

Thereafter, Mr. Rice did not interview Plaintiff, Raymond Carnelli, or Jeremiah
Carnelli, and did not contact Defendant or anyone else at the Boston Police Department.
Mr. Rice did not request any other reports or documents from the Boston Police
Department related to the June 2009 incident and Mr. Rice "conducted absolutely no
investigation" into it. *Id.* at 28, ¶ 43. Mr. Rice did not create a report as he typically
would do when conducting a misconduct investigation. Plaintiff was neither charged
with misconduct nor subjected to formal discipline by VT DOC or VT DHR as a result of
the Memo.

On January 28, 2013, Plaintiff's attorney faxed a letter to Mr. Arnell which stated, in relevant part:

> We are counsel for [Plaintiff] in a civil case pending in Suffolk Superior Court in Boston, Massachusetts and have been informed that recently your department received an anonymous phone call from someone in Boston who made negative allegations against [Plaintiff]. As a result, [Plaintiff] is requesting an administrative paid leave of absence.

*Id.* at 29, ¶ 49. The letter further stated: "[Plaintiff] requests that his leave extend and that he resume his duties as Correctional Officer I after a full investigation is completed and submitted in writing which he believes will clear him of the allegations made against him." *Id.* at 29, ¶ 50.

On February 5, 2013, Plaintiff's attorney faxed another letter to VT DHR, stating that Plaintiff and his counsel were aware of "negative allegations made against [Plaintiff]" and that "[attorney Loughlin] received a request from your facility for information on this matter and she then forwarded excerpts of deposition testimony taken from several witnesses in the [Massachusetts action]." *Id.* at 30, ¶ 51. The letter stated that Plaintiff believed that his "personal safety is compromised" and that:

> In this situation, he believes a temporary leave of absence is the best course for himself as well as in the interest of the Chittenden Facility. [Plaintiff] will resume his duties as Correctional Officer I on August 1, 2013. He believes this is necessary to allow sufficient time for a full investigation in to this matter by our office as well as by the administration of the Chittenden Facility which he again requests.

*Id.* Pursuant to his request, Plaintiff was granted a leave of absence.

On February 5, 2013, VT DHR supervisors and managers held a telephone conference to discuss employment issues involving state employees including Plaintiff. During this conference, it was decided that there would be no further investigation of the contents of the Memo or the statements made by Plaintiff during his depositions. Plaintiff would, however, be required to undergo a fitness for duty examination prior to returning from his six-month leave of absence.

On July 19, 2013, while Plaintiff was still on leave, VT DOC sent him the following letter:

Before you began your unpaid leave in late January of this year, information came to my attention which gave me reason to be concerned about your health and wellbeing, and to question your ability to safely and capably perform your job. Because of these concerns, we need you to please submit to examination by a physician and/or clinical psychologist before returning to work. The State will designate and pay for the expert to determine your fitness for duty. We are concerned about your safety, the safety of your co-workers, and your current ability to do your job.

In your email message of July 10, 2013, you inquired about an internal investigation at the Chittenden facility. In reviewing the information available, [VT] DOC determined that there was insufficient known evidence to warrant an investigation into your potential misconduct. [VT] DOC is also unaware of any reason to believe that anyone poses a danger to you at the facility—as your email suggests—please immediately detail all of your concerns, so [VT] DOC can evaluate them.

This action is being taken pursuant to Article 35, Section 2, (b) (6) of the Agreements between the State of Vermont and the Vermont State Employees' Association. This is not a disciplinary action and should not be construed as such; however, your failure to follow the instructions in this letter could lead to disciplinary action, up to and including dismissal.

*Id.* at 38-39, ¶ 57.

The agreements between the State of Vermont and the Vermont State Employees' Association reached through collective bargaining govern Plaintiff's employment rights and relations with his employer. Article 35, Section 2, (b)(6) provides:

(6) An appointing authority, or delegated representative, may require, when there is sufficient reason, the submission of a certificate from a physician or other evidence to:

(i) justify the approval of sick leave; and

(ii) furnish evidence of good health and ability to perform work without risk to self, coworkers, or the public as a condition of returning to work. Whenever a doctor's certificate is required, as a condition for approval of sick leave usage, the time period for such requirement shall not normally exceed six (6) months (unless specifically imposed for a lesser period of time), and may be extended for up to an additional six (6) month period of time.

> The State may require an employee to be examined by a
> physician designated by the employer, at State expense, for
> the purpose of determining the employee's fitness for duty.

*Id.* at 39, ¶ 58.

On July 26, 2013, Plaintiff received a letter informing him that the fitness for duty examination would last five hours and take place on August 2 and August 8, 2013 at the office of psychologist Claire Gilligan.  On July 31, 2013, Ms. Royce and Plaintiff exchanged e-mails in which Plaintiff objected to undergoing the fitness for duty examination.  Ms. Royce informed Plaintiff that he was "not under investigation, now or previously."  *Id.* at 41, ¶ 62.

Plaintiff did not attend the scheduled examination in August because he was in Connecticut caring for his ailing grandfather.  Had Plaintiff attended the August examination and been determined fit for duty, he would have been permitted to return to work immediately.  Plaintiff ultimately attended the fitness for duty examination with Ms. Gilligan in January of 2014.

Ms. Jewett, who was responsible for setting up the examination with Ms. Gilligan, informed Ms. Gilligan that Plaintiff had expressed suicidal and homicidal statements, but declined to provide information about the statements.  Although Ms. Jewett provided Ms. Gilligan with a copy of Plaintiff's job description, she did not provide a copy of the Memo or any of the deposition transcripts.

During the evaluation in January of 2014, Plaintiff told Ms. Gilligan that when he was deposed in the Massachusetts action he testified that "he has never expressed any thoughts, plans[,] or intent to harm others . . . other than what he disclosed at his deposition related to his nightmares."  *Id.* at 45, ¶ 70.  He provided a copy of the Memo to Ms. Gilligan.

In February of 2014, Ms. Gilligan issued a report finding Plaintiff fit to return to duty.  Plaintiff returned to work shortly thereafter without restriction.  During his leave of absence, there was no justification for paying Plaintiff but VT DOC allowed him to use accrued paid leave that he had saved.

E.    **Settlement of the Massachusetts Action.**

On June 3, 2014, the Massachusetts action was settled, resulting in a voluntary stipulation of dismissal in July of 2014.  As part of the settlement, the parties executed a release (the "Release") which provides in relevant part:

> Releasor does hereby remise, release and forever discharge [Defendant and the other defendants to the Massachusetts action], and all of their subdivisions, officers, agents, principals, employees, servants, partners, associates, trustees, independent contractors, owners, affiliates, representatives, heirs, executors, administrators, beneficiaries, successors or assigns and attorneys, insurers, reinsurers, and insurance agents, past and present (hereinafter all collectively "Releasees"), from all debts, demands, actions, causes of action, suits, dues, sum and sums of money, accounts reckonings, bonds, covenants, contracts, controversies, agreements, promise, doings, omissions, variances, damages, extent, executions and liabilities and any and all claims of every kind, nature and description whatsoever, both in LAW and EQUITY, including any claims whatsoever pursuant to M.G.L. c. 93A and/or 176D, which against Releasees, [Plaintiff] now has, ever had, or will ever have on account of any losses, damages, injuries, emotional distress, expenses, costs, or fees allegedly sustained or incurred by [Plaintiff] or which have yet to be sustained or incurred by [Plaintiff] arising out of [the June 2009 incident] . . . and which is the subject of [Plaintiff's] complaint against [Defendant and the other defendants in the Massachusetts action].

*Id.* at 46, ¶ 72.

II.    **The Disputed Facts.**

The parties dispute whether the statements in the Memo were true.  Defendant asserts that he "considered [Plaintiff's] statements and actions as threatening and he was concerned for his personal safety[,]" *id.* at 17, ¶ 23, and that he "was also concerned about [Plaintiff's] fitness to work as a correctional office[r] and protect the individuals under his care[,]" *id.* at 22, ¶ 24.  In support, Defendant cites the Memo and portions of his deposition transcript.

While Defendant is generally the sole arbiter of what he thought and felt, Plaintiff disputes that Defendant's Memo supports his assertions.  The subject of the Memo is "Homicidal Threats Made Towards Myself" and the Memo asserts Plaintiff "made suicidal and homicidal threats towards [Defendant]." (Doc. 43-11 at 2.)  Plaintiff points

out that Defendant's attorney told Defendant that Plaintiff had expressed only suicidal and homicidal *thoughts*. She did not advise him of any threats. Moreover, Defendant's attorney did not inform him of Plaintiff's statements until after Plaintiff's January deposition, which Plaintiff contends undermines any claim that Defendant's attorney perceived an imminent risk to Defendant's physical safety. Plaintiff further points out that Defendant was never advised, instructed, or approved to send his Memo to VT DOC, and did not discuss it with his supervisor before sending it. Plaintiff argues that this creates a reasonable inference that Defendant drafted the Memo so that it would appear as if it was responsive to an inquiry or directive by his superior. He notes that Defendant did not contact any law enforcement agencies, bring charges, or obtain a restraining order against him, and advised the Boston Police Department Internal Affairs investigator that his intention in sending the Memo was "just to make [VT DOC] aware of what, um, that—of what [Plaintiff] did." (Doc. 46-10 at 14, 13:15-16.) In doing so, Defendant acknowledged that he was aware the Memo might impact Plaintiff's employment.

Defendant, in turn, responds that Plaintiff was not aware of the Memo until after he requested and was granted a leave of absence. In his request for a leave of absence, Plaintiff expressed his belief that VT DOC had "received an anonymous phone call from someone in Boston who made negative allegations against [him]." (Doc. 53 at 29, ¶ 49.) Plaintiff, however, contends that he requested a leave of absence because the Memo triggered a VT DOC investigation, which exacerbated his PTSD. The parties dispute whether there was a VT DOC "investigation," or whether there were simply VT DOC concerns.

The parties further dispute whether VT DOC's decision to require Plaintiff to undergo a fitness for duty examination prior to his return from his leave of absence was solely due to the Memo, or whether other information contributed to that decision as well. Defendant points to deposition testimony of Ms. Royce, Ms. Jewett, and Mr. Arnell in which they testified that the deposition testimony in the Massachusetts action caused them concern and would be sufficient to require Plaintiff to undergo a fitness for duty examination prior to returning to work. Plaintiff does not dispute this assertion, but

18

points to Ms. Royce's acknowledgement that the contents of Defendant's Memo were also of concern to VT DOC and VT DHR and considered in their decision-making.

In addition to disputing the impetus for the fitness for duty examination, the parties disagree whether requiring an employee to undergo a fitness for duty examination is a "disciplinary" action. Defendant cites VT DOC's July 19, 2013 letter which states that requirement of undergoing a fitness for duty examination "'is not a disciplinary action and should not be construed as such[.]'" (Doc. 53 at 39, ¶ 57) (quoting Doc. 43-23 at 2). Defendant also points to the following deposition testimony of Ms. Royce:

Q.  Requiring an individual to undergo a fitness for duty [examination], is that a disciplinary action?

A.  No.

(Doc. 53-2 at 2, 88:17-19.) Plaintiff, however, cites the letter notifying him of the requirement that failure to submit to the fitness for duty examination "could lead to disciplinary action, up to and including dismissal." (Doc. 43-23 at 2.) In any event, he contends that whether the requirement was "disciplinary" does not determine whether he suffered harm, including lost wages while on leave. His counselor Ms. Jacques testified that the examination made Plaintiff "very anxious" and resulted in "loss of sleep, vivid dreams and flashbacks of traumatic assault." (Doc. 46-13 at 62, 196:10-15.)

## III.   Conclusions of Law and Analysis.

### A.   Standard of Review.

Summary judgment must be granted when the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine dispute exists when the evidence is such that, if the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party." *S.E.C. v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

19

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [Rather], the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations, emphasis, footnote, and internal quotation marks omitted).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

Before addressing Defendant's request for summary judgment on Plaintiff's substantive claims, the court addresses his affirmative defenses of release and qualified immunity, which, if established, would bar Plaintiff's claims.

**B.    Whether the June 2014 Release Bars Plaintiff's Claims.**

Defendant asserts that he is entitled to judgment in his favor pursuant to the June 2014 Release in the Massachusetts Action which he characterizes as a "general release." He points out that, at the time Plaintiff signed the Release, he had passed the fitness for duty examination and returned to his employment. Plaintiff thus knew of Defendant's alleged actions and the potential harm they caused when he signed the Release. Plaintiff counters the Release is a limited release that discharges only his claims "arising out of" the June 2009 incident.

Under Massachusetts law, a release is a contract the interpretation of which is a question of law. *See Leblanc v. Friedman*, 781 N.E.2d 1283, 1287 (Mass. 2003). "Generally speaking, a written contract, clear in its terms and freely entered into, is binding on both parties according to its terms." *Crocker v. Townsend Oil Co., Inc.*, 979 N.E.2d 1077, 1085 (Mass. 2012) (internal quotation marks omitted). "Contractual language is ambiguous when it can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken[.]" *Balles v. Babcock Power Inc.*, 70 N.E.3d 905, 911 (Mass. 2017) (internal quotation marks omitted). "When contract language is unambiguous, it must be construed according to its plain meaning." *Id.*

"General releases dispose of all claims and demands arising out of *any* transactions between the parties." *Leblanc*, 781 N.E.2d at 1287 (internal quotation marks omitted). "[A] release may be prompted by the settlement of a specific dispute or resolution of a specific issue, but broad wording in the release operates to settle all other, unrelated matters, even if they were not specifically in the parties' minds at the time the release was executed." *Eck v. Godbout*, 831 N.E.2d 296, 300-01 (Mass. 2005). "If exceptions were intended to the scope of the releases, they should [be] stated." *Schuster v. Baskin*, 236 N.E.2d 205, 208 (Mass. 1968). "The mere fact that the release itself identifies the specific matter that prompted the parties to execute a release, does not, by itself, operate to restrict the scope of a release that contains broad language releasing all claims[.]" *Eck*, 831 N.E.3d at 301.

The Release states that it releases "any and all claims" but also contains language indicating that the parties intended the Release to discharge claims "arising out of the [June 2009 incident]." In light of this limiting language, a reasonable interpretation of the Release is that it discharges liability for "any and all claims" only to the extent that they "aris[e] out of" the June 2009 incident. Because Plaintiff's claims in this action do not "aris[e] out of" the June 2009 incident, but instead allegedly arise out of the Memo, they would not be discharged by the Release according to this interpretation.

21

Defendant contends that *Eck* demands a different result. In that case, the Supreme Judicial Court of Massachusetts held that a "broadly worded release" followed by the language "and more specially for personal injuries sustained [as a result of alleged negligence and breach of contract]" was a general release. *Id.* at 300. The court observed that the identification of the claims related to the alleged negligence and breach of contract was "introduced by the conjunctive 'and'" and therefore it "expressly states that, *in addition to* the broadly described category of 'all' claims being released" the releasor was also releasing the releasee from the specific claims. *Id.* at 301 ("In effect, the use of 'and more specially for' operates as the equivalent of 'including but not limited to.'"). Here, in contrast, the Release does not include either the conjunctive or "and more specially" language. In this respect, the Release more closely resembles the release at issue in *Leblanc*:

> Massachusetts cases interpreting general releases have encountered documents breathtaking in their scope. In *Naukeag Inn, Inc. v. Rideout*, [220 N.E.2d 916 (Mass. 1968)], for example, one party released all claims which "I [sic ] may hereafter have from anything which has heretofore happened." In *Atlas Tack Corp. v. Crosby*, 41 Mass.App.Ct. 429, 431, 671 N.E.2d 954 (1996), the plaintiff discharged the defendant "from all manner of actions, causes of action . . . which [the plaintiff] ever had, now has or which it or its successors can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents."
>
> While the release in this case contains some of the same language, referring repeatedly to "all claims" that the LeBlancs might have had, it also contains limiting language. Every paragraph of the document is qualified such that it relates back to a phrase in the first paragraph—that released the four parties "from all claims . . . resulting from *care and treatment rendered to Diane LeBlanc on or about March 16, 1992* " (emphasis added). Paragraph two refers to any claims "on account of, or in anyway growing out of, *said care and treatment* or its results" (emphasis added). Paragraph three pertains to claims against other parties "who are or might otherwise be liable in anyway for *the care and treatment rendered to the undersigned and which is the subject matter of this settlement*" (emphasis added). Most importantly, paragraph four, which discharges the four parties from liability for claims for "unknown" injuries, does so for such claims which "may hereafter in anyway grow out of or be connected with *said care and*

*treatment* [or] its results" (emphasis added). In light of this limiting
language, we interpret the release to discharge the liability of the four
parties for "unknown" injuries only to the extent that such injuries in "any
way grow out of" or are "connected with" the care and treatment that Mrs.
Leblanc received on March 16, 1992, the only "care and treatment"
referenced in the release.

781 N.E.2d at 1288 (footnote omitted); *see also Airgas E., Inc. v. Med.-Tech. Gases, Inc.*,

965 N.E.2d 224 (Mass. App. Ct. 2012) ("Releases of this type—employing language

specifically referring to only one occurrence or transaction—are limited to claims and

demands arising out of that specific occurrence or transaction.").

Because the Release in this case more closely resembles the limited release in

*Leblanc* than the general release in *Eck*, Defendant has failed to establish as a matter of

law that the Release bars each of Plaintiff's claims. Defendant's motion for summary

judgment on the basis of the Release is therefore DENIED.

## C.   Whether Defendant Is Entitled to Summary Judgment on Qualified Immunity Grounds.

Defendant asserts he is entitled to qualified immunity for Plaintiff's Vermont

common law tort claims, because no controlling precedent establishes that he violated

Vermont law by sending the Memo to VT DOC. Plaintiff argues there are disputed

issues of material fact regarding whether Defendant was performing a discretionary act

within the scope of his employment when he sent the Memo, and whether he sent the

Memo in good faith.

"[T]he substantive law of Vermont governs the applicability of qualified immunity

to [Plaintiff's] state law claims[.]" *Napolitano v. Flynn*, 949 F.2d 617, 621 (2d Cir.

1991). Under Vermont law, "[q]ualified immunity attaches to public officials who are

(1) acting during the course of their employment and acting, or reasonably believing they

are acting, within the scope of their authority; (2) acting in good faith; and (3) performing

discretionary, as opposed to ministerial, acts." *Baptie v. Bruno*, 2013 VT 117, ¶ 11,

195 Vt. 308, 314, 88 A.3d 1212, 1216 (internal quotation marks omitted). "The outcome

of the analysis depends on the objective reasonableness of the official's conduct in

relation to settled, clearly-established law." *Cook v. Nelson*, 712 A.2d 382, 384 (Vt. 1998).

A "discretionary duty" is "one requiring the exercise of judgment in its performance," whereas a "ministerial duty" is "one where 'nothing is left to discretion—a simple and definite duty, imposed by law, and arising under conditions admitted or proved to exist.'" *Libercent v. Aldrich*, 539 A.2d 981, 984 (Vt. 1987) (quoting *State v. Howard*, 74 A. 392, 395 (Vt. 1909)).

> [W]hether the act of a government employee is discretionary so as to make the employee immune from personal tort liability requires a case-by-case examination of the nature of the act to determine whether the employee's action involved the type of policy considerations not suitable for review under the judicial system's traditional tort standards.

*Hudson v. Town of E. Montpelier*, 638 A.2d 561, 565-66 (Vt. 1993). "This rule allows the state officer or employee sufficient freedom to determine the best method of carrying out his or her duties, while ensuring that those duties are fulfilled in a conscientious manner." *Libercent*, 539 A.2d at 984.

"Good faith exists where an official's acts did not violate clearly established rights of which the official reasonably should have known." *Murray v. White*, 587 A.2d 975, 980 (Vt. 1991) (footnote omitted). "The good faith inquiry 'does not ask whether plaintiff's rights were violated, but rather whether the official reasonably should have known that what she was doing violated plaintiff's rights.'" *Stevens v. Stearns*, 2003 VT 74, ¶ 15, 175 Vt. 428, 434, 833 A.2d 835, 840 (quoting *Murray*, 587 A.2d at 980). "An official's subjective intent is irrelevant." *Id.*

In this case, the facts are in dispute regarding whether Defendant was performing a discretionary duty in the course of his employment as a police officer when he sent the Memo to VT DOC. Defendant concedes he was never directed or approved to send the Memo, and Plaintiff contends its transmission was in violation of applicable regulations. There is also a disputed issue of material fact regarding whether Defendant was acting in good faith out of genuine concern for Plaintiff's safety and those in Plaintiff's care, or whether he acted maliciously with the intent to adversely impact Plaintiff's employment.

Defendant's credibility is essential to a determination of his motive. *See Proctor*, 846 F.3d at 608 (explaining that credibility determinations must be left to the jury).

Although Defendant relies heavily on the absence of clearly established authority that would have prohibited him from sending the Memo, the Second Circuit has held that the prohibition on the provision of false evidence is "clearly established." *See Garnett v. Undercover Officer C0039*, 838 F.3d 265, 276 (2d Cir. 2016) ("[F]abrication of evidence violate[s] a 'clearly established constitutional right[][.]'") (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).

Because these are genuine issues of material fact that must be resolved to determine whether Defendant was performing a discretionary task within the scope of his employment when he sent the Memo, and whether he sent it in good faith, summary judgment is inappropriate. *See Sakoc v. Carlson*, 656 F. App'x 573, 577-78 (2d Cir. 2016) (holding that underlying facts need to be established before issue of qualified immunity can be determined); *see also Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 234 n.2 (2d Cir. 2015) ("Summary judgment may be granted only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.") (internal quotation marks omitted). Defendant's motion for summary judgment on the basis of qualified immunity is therefore DENIED.

### D.     Whether Defendant is Entitled to Summary Judgment on Plaintiff's Claim for Tortious Interference with Contract (Count I).

Defendant asserts that, as a matter of law, Plaintiff's tortious interference with contract claim fails because Plaintiff cannot establish the essential elements of the tort. Vermont law recognizes a claim for "liability against one who intentionally intrudes to disrupt an existing contract relation." *Mitchell v. Aldrich*, 163 A.2d 833, 835-36 (Vt. 1960). "In order 'to be liable for interference with a contractual relationship, the defendant must have intentionally and improperly induced or caused [a person] not to perform under its contract with the plaintiff.'" *Trepanier v. Getting Organized, Inc.*, 583 A.2d 583, 589 (Vt. 1990) (alteration in original) (quoting *Williams v. Chittenden Tr. Co.*, 484 A.2d 911, 913 (Vt. 1984)). "The right protected is the right to be secure in one's

business relations." *Kollar v. Martin*, 706 A.2d 945, 946 (Vt. 1997). "The act of interference must be wrongful or improper by some measure beyond the fact of interference itself." *Id.* (citation omitted).

It is undisputed that Plaintiff's employment contract permitted VT DOC to require him to undergo a fitness for duty examination. *See* Doc. 53 at 39, ¶ 58 ("The State may require an employee to be examined by a physician designated by the employer, at State expense, for the purpose of determining the employee's fitness for duty."). The basis for VT DOC's requirement that Plaintiff submit to an examination is disputed. Although Defendant asserts it was due solely to the deposition transcript excerpts, Plaintiff has proffered evidence that the Memo was also a factor.

Regardless of the impetus for the fitness for duty examination, Defendant argues that VT DOC did not fail to perform its contract with Plaintiff. Instead, it was Plaintiff that requested a leave of absence. Although Defendant has the better part of this argument, Plaintiff is correct that there is no evidence that he would have taken a leave of absence or been required to submit to a fitness for duty examination in the absence of Defendant's interference. He points out that failure to submit to a fitness for duty examination would have led to "disciplinary action, up to and including dismissal." (Doc. 43-23 at 2.) Whether the interruption of Plaintiff's employment in this manner rises to the level of contractual interference must be determined by the finder of fact. *See Prince v. Entergy Nuclear Operations, Inc.*, 2011 WL 3363207 (D. Vt. 2011) (finding tortious interference with a prospective business relationship plausibly alleged where plaintiff's new employer delayed plaintiff's employment start date and forced him to undergo an otherwise unnecessary psychological evaluation because of defendant's provision of erroneous information regarding Plaintiff's security clearance).[2]

---

[2] The Vermont Supreme Court has held that tortious interference with prospective contractual relations "protects the same interest in stable economic relationships as does the tort of interference with contract, but applies to business relationships not formally reduced to contract." *Gifford v. Sun Data, Inc.*, 686 A.2d 472, 474 (Vt. 1996). "The principal distinction between the two is that a 'broader range of privilege to interfere is recognized when the relationship or

Viewing both the cause of the alleged interference and the gravity of the interference in the light most favorable to Plaintiff, and drawing all reasonable inferences in Plaintiff's favor, the court cannot determine as a matter of law that Defendant is entitled to judgment in his favor with regard to Plaintiff's tortious interference with contract claim. Summary judgment on Count I is therefore DENIED.

## E. Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Claim for Defamation (Count II).

Defendant contends that he is entitled to summary judgment on Plaintiff's claim for defamation because the undisputed material facts show that publication of the Memo was privileged. He further contends that his statements were true and that he was not negligent in publishing them.

Under Vermont law, defamation consists of:

(1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages.

*Stone v. Town of Irasburg*, 2014 VT 43, ¶ 61, 196 Vt. 356, 380-81, 98 A.3d 769, 785 (quoting *Lent v. Huntoon*, 470 A.2d 1162, 1168 (Vt. 1983)). "A defamatory statement is one that tends to 'blacken the reputation of the plaintiff and expose [him] to public hatred, contempt[,] or ridicule.'" *Davis v. Am. Legion, Dep't of Vermont*, 2014 VT 134, ¶ 22, 198 Vt. 204, 213, 114 A.3d 99, 106 (quoting *Kinsley v. Herald & Globe Ass'n*, 34 A.2d 99, 101 (Vt. 1943)).

Defendant argues that his Memo is protected by a conditional privilege because Plaintiff's fitness to serve as a law enforcement agent is an important public interest which Defendant properly addressed as a law enforcement officer. There is generally no liability for publication of false and defamatory statements "if they are 'published upon an occasion that makes [them] conditionally privileged' and 'the privilege is not abused.'" *Skaskiw v. Vermont Agency of Agric.*, 2014 VT 133, ¶ 10, 198 Vt. 187, 193,

economic advantage interfered with is only prospective.'" *Id.* (quoting *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 590 (Cal. 1990)).

112 A.3d 1277, 1283 (alteration in original) (quoting Restatement (Second) of Torts § 593 (1977)).

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
>
> > (a) there is information that affects a sufficiently important public interest, and
> >
> > (b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.

Restatement (Second) of Torts § 598.[3]  This conditional privilege "is applicable to defamatory communications to public officials concerning matters that affect the discharge of their duties." *Id.* § 598 cmt. e.  Such duties "include supervision of inferior officers, [which] in many cases carries with it the power to remove or discipline the inferiors for neglect of duty or malfeasance in office, or to report the misconduct to heads of departments or other persons having the power of removal or discipline." *Id.*

"Even though the publication is privileged, a particular person cannot avail himself of the privilege if he abuses it." *Id.* § 598 cmt. a.

> The privilege is abused when the defendant knows the matter to be false or acts in reckless disregard as to its truth or falsity; communicates the matter for an improper purpose; knowingly communicates the matter to individuals not otherwise privileged; or does not reasonably believe that communicating the matter is necessary to accomplish the purpose for which the privilege is given.

*Skaskiw*, 2014 VT 133, ¶ 10 (citations and internal quotation marks omitted).

Accordingly, the communication must have been made "in furtherance of the interests sought to be protected by the conditional privilege and not 'solely from spite or ill will.'"

---

[3] Vermont does not appear to have adopted the conditional privilege set forth in § 598, but it has expressly adopted the conditional privilege in § 598A which "makes a publication conditionally privileged if an inferior administrative officer of a state or any of its subdivisions who is not entitled to an absolute privilege makes a defamatory communication required or permitted in the performance of his official duties."  Restatement (Second) of Torts § 598A; *see also Skaskiw v. Vermont Agency of Agric.*, 2014 VT 133, ¶ 11, 198 Vt. 187, 194, 112 A.3d 1277, 1284 ("Given our previous reliance on the Restatement in this area of law, we adopt [§ 598A].").  If presented with the question, it is therefore likely the Vermont Supreme Court would also adopt § 598.

*Id.* ¶ 10. The Vermont Supreme Court has "characterized the elements of the abuse of a privilege as the presence of 'malice.'" *Id.* (quoting *Crump v. P & C Food Mkts., Inc.*, 576 A.2d 441, 448 (Vt. 1990)). A conditional privilege is "overcome by a showing of one of two forms of malice: (1) conduct manifesting personal ill will, reckless or wanton disregard of plaintiff's rights, or carried out under circumstances evidencing insult or oppression or (2) knowledge of the statement's falsity or with reckless disregard of its truth." *Id.* (internal quotation marks omitted).

Plaintiff's fitness for duty as a correctional officer is an important public interest. However, unlike the police officer supervisor in *Turner v. Fletcher*, 706 N.E.2d 514 (Ill. App. Ct. 1999), Defendant had no supervisory responsibility over Plaintiff, no obligation to report his concerns to Plaintiff's employer, and no potential liability if he failed to report them. Defendant's motive in sending the Memo is therefore paramount and his credibility must be evaluated in making that determination. *See Skaskiw*, 2014 VT 133, ¶ 10 (explaining that the conditional privilege does not apply if the communication results "solely from spite or ill will") (internal quotation marks omitted). Because there are genuine issues of material fact regarding whether Defendant acted with malice in sending the Memo, summary judgment on the basis of a conditional privilege cannot be granted. *See Prop. & Cas. Ins. Co. of Hartford v. Davenport*, 907 F. Supp. 2d 561, 567 (D. Vt. 2012) ("Whether a person is capable of acting with a particular mental state is typically a question of fact for the jury.").

A similar result is warranted for Defendant's contention that his statements were true. Although truth is a "complete defense to defamation[,]" *Lent*, 470 A.2d at 1169, "for the defense of truth to apply, it is now generally agreed that it is not necessary to prove the literal truth of the accusation in every detail, and that it is sufficient to show that the imputation is substantially true." *Russin v. Wesson*, 2008 VT 22, ¶ 8, 183 Vt. 301, 304, 949 A.2d 1019, 1021 (alterations and internal quotation marks omitted). "Put another way, it is sufficient if the substance, the gist, the sting, of the matter is true." *Id.* (internal quotation marks omitted). "The inquiry is whether the alleged defamatory statement produces a different effect upon the reader than that which would be produced

29

by the literal truth of the matter." *Id.* (alterations and internal quotation marks omitted). A "common-sense 'substantial truth' standard" thus applies "in a private-party case like this, for the important free-speech interests at stake." *Id.* at ¶ 7.

In this case, there is a close question as to whether Defendant's statement in the Memo that Plaintiff "made suicidal and homicidal threats toward me" is true. (Doc. 43-11 at 2.) On the one hand, no threats of any kind were made directly to Defendant. On the other hand, Plaintiff repeatedly stated that he wanted to kill people and there is a reasonable inference that this included Defendant as the alleged perpetrator of the June 2009 incident. A jury, weighing the evidence as well as credibility, may conclude that the "sting" of the Memo is true.

The parties further dispute whether it was the Memo or the deposition transcripts that produced the adverse effect on VT DOC as the recipient. Defendant asserts that he has proffered direct evidence that the Memo did not produce a substantially different effect on VT DOC and VT DHR than evidence derived from the deposition transcript excerpts. Plaintiff counters that regardless of whether the effect of the deposition transcripts upon VT DOC and VT DHR was different than the effect of the Memo, there is no evidence that VT DOC or VT DHR would have received any documents related to the Massachusetts action had Defendant not interfered in Plaintiff's employment. Plaintiff further points to the testimony of Ms. Royce that both the Memo and the deposition excerpts were causal factors in VT DOC's request for a fitness for duty examination.

Finally, even if the statements in his Memo were inaccurate, Defendant contends that because he did not attend Plaintiff's depositions, there is no evidence that he could or should have known of any inaccuracies prior to sending his Memo to VT DOC. He therefore asserts that Plaintiff will be unable to establish that he was negligent or had a greater level of fault in the Memo's publication.

Defendant's lack of negligence or greater fault in this case depends on his state of mind in sending the Memo. He was either innocently mistaken as to the information provided by his attorney (who denies advising him of direct threats), or he deliberately

recast what she told him in more inflammatory terms so as to impact Plaintiff's employment. In such circumstances, "the determination of whether [Defendant] was negligent in [his] publication of the statement must also be left to the jury." *Marcoux-Norton v. Kmart Corp.*, 907 F. Supp. 766, 779 (D. Vt. 1993)). Summary judgment in Defendant's favor on Count II is therefore DENIED.

## F.   Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Claim for Intentional Infliction of Emotional Distress (Count III).

"Vermont recognizes the tort of intentional infliction of emotional distress." *Crump*, 576 A.2d at 448. A plaintiff's "burden of proof on a claim of intentional infliction of emotional distress is a heavy one." *Gallipo v. City of Rutland*, 656 A.2d 635, 643 (Vt. 1994). The plaintiff "must demonstrate that defendants' conduct was so outrageous as to surpass all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (alteration and internal quotation marks omitted). "Established law[] . . . posits an objective test for outrageousness: a plaintiff must demonstrate legal harm resulting from inflicted distress so severe that no reasonable person could be expected to endure it." *Baldwin v. Upper Valley Servs., Inc.*, 644 A.2d 316, 319 (Vt. 1994). Liability may not be predicated on "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Denton v. Chittenden Bank*, 655 A.2d 703, 706 (Vt. 1994) (internal quotation marks omitted). However, "[o]therwise unactionable conduct may become extreme and outrageous in character if an actor knows 'that the other is peculiarly susceptible to emotional distress by reason of some physical or mental condition or peculiarity,' and the actor proceeds in the face of that knowledge." *Id.* at 707 (alteration omitted) (quoting Restatement (Second) of Torts § 46 cmt. f).

When Defendant sent his Memo to VT DOC, he was arguably aware "that [Plaintiff] is peculiarly susceptible to emotional distress[.]" *Id.* If Plaintiff establishes that Defendant did not act in good faith in sending the Memo, but rather sent it in an effort to adversely impact Plaintiff's employment, a jury may find his conduct sufficiently outrageous to find Defendant liable for intentional infliction of emotional

31

distress.  *See Crump*, 576 A.2d at 448 (recognizing that "abuse of a position of authority vis-à-vis plaintiff" may "provide grounds for the tort action").  Based on the disputed facts of record, the court cannot decide the claim as a matter of law.  Defendant's motion for summary judgment on Plaintiff's intentional infliction of emotional distress claim is therefore DENIED.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Doc. 41) is DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this ___21st___ day of August, 2017.

Christina Reiss, Chief Judge
United States District Court